UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

RENEN VIDES,

                     Petitioner,

        v.

CHAD WOLF, in his official capacity as
Acting Secretary, U.S. Department of
Homeland Security, et al.,

                     Respondents.

_____

**DECISION AND ORDER**

6:20-CV-06293 EAW

## INTRODUCTION

Petitioner Renen Vides ("Petitioner"), an immigration detainee represented by counsel and currently detained at the Buffalo Federal Detention Facility ("BFDF"), seeks an emergency *writ of habeas corpus* pursuant to 28 U.S.C. § 2241. (Dkt. 1). Petitioner seeks immediate release, alleging that he faces imminent danger due to his potential exposure to COVID-19 while in custody, or, in the alternative, he seeks a bond hearing before an immigration judge. (*Id.* at 26-27). For the reasons discussed below, the Petition is granted in part and denied without prejudice in part.

## BACKGROUND

### I. Petitioner's Factual Background

The following facts are taken from the Petition, Respondents' Answer, and their supporting documents. Where the parties specifically controvert particular facts, the Court has noted the disagreement.

- 1 -

Petitioner was born on December 30, 1985, in Guatemala. (*Id.* at ¶ 15). When he was nine years old, his mother died, and he moved to Guatemala City to live with his father and stepmother. (*Id.* at ¶ 16). His father and stepmother beat him with braided electrical cords and forced him to perform domestic labor. (*Id.*). Petitioner ran away at 14, eventually living with his aunt and uncle. (*Id.*). In 2002, his cousin, whose parents Petitioner was living with, was shot and killed by narco-traffickers. (*Id.* at ¶ 17). The narco-traffickers began making threatening calls and visits to Petitioner's home, and Petitioner fled to the United States in 2003 with his entire immediate family. (*Id.* at ¶¶ 17-18). Petitioner entered the United States illegally, without admission or inspection, at an unknown time and place. (Dkt. 10 at ¶ 3). Shortly after arriving in New York, Petitioner met his partner with whom he had a son. (Dkt. 1 at ¶ 18).

In the United States, Petitioner was diagnosed with a seizure disorder and prescribed medication. (*Id.* at ¶ 19). Due to the infrequency of his seizures, and the expense and ineffectiveness of the medication, Petitioner stopped taking the medicine. (*Id.*). On their ten-year anniversary, Petitioner and his partner went to breakfast with their son, who was then four years old. (*Id.* at ¶ 20). Petitioner had a seizure while driving the car, and his partner and son were both killed. (*Id.*). On December 2, 2016, Petitioner pled guilty to two counts of manslaughter in the second degree, and was sentenced to five years probation. (*Id.* at ¶ 21; Dkt. 10 at ¶ 4; Dkt. 10-2 at 6).

A Warrant for Arrest of Alien was issued on October 3, 2018 (*id.* at ¶ 5), and on March 28, 2019, Petitioner was detained at the Bergen County Jail in Hackensack, New Jersey, and placed into removal proceedings. (Dkt. 1 at ¶ 22; Dkt. 10 at ¶¶ 5-6). Petitioner

received a Notice of Custody Determination from the Department of Homeland Security ("DHS"), advising him that he would be detained pending an outcome in his removal proceedings. (Dkt. 10 at ¶ 8). On April 8, 2019, Petitioner appeared before an immigration judge ("IJ") for a removal hearing. (Dkt. 1 at ¶ 49; Dkt. 10 at ¶ 9). The IJ allowed an attorney to appear as a friend of the court and granted an adjournment until May 1, 2019, so that Petitioner could retain counsel. (Dkt. 1 at ¶ 49; Dkt. 10 at ¶ 9). At the May 1 hearing, the same attorney appeared on behalf of Petitioner and was served with the evidence in his case. (Dkt. 1 at ¶ 50; Dkt. 10 at ¶ 10). The hearing was again adjourned to June 17, 2019, to give Petitioner's counsel an opportunity to prepare. (Dkt. 1 at ¶ 50; Dkt. 10 at ¶ 10).

At the June 17 hearing, Petitioner moved to suppress evidence in his removal hearing and to terminate the proceedings. Counsel for United States Immigration and Customs Enforcement ("ICE") requested two weeks to respond to the motion, and a hearing was set for July 22, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 11). Both parties requested two-week adjournments, and the hearing was reset for August 5, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶¶ 12-14). At the hearing, the IJ denied Petitioner's motions, Petitioner filed an I-589 application for asylum, withholding or removal, and relief under the Convention Against Torture based on his fear of return to Guatemala due to his cousin's murder and continued threats to his family. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 15). His removal hearing was scheduled for September 5, 2019. (Dkt. 1 at ¶ 51; Dkt. 10 at ¶ 15).

On August 25, 2019, Petitioner contends that he was attacked by a detainee at the Bergen County Jail involved with the Mara Salvatrucha gang, commonly referred to as

MS-13.  (Dkt. 1 at ¶ 23).  The detainee and other gang members had previously bullied Petitioner because of his seizure condition.  (Dkt. 11-1 at ¶ 4).  Petitioner also contends that gang members threatened to "jump" him and to send gang members in Guatemala to kill Petitioner if he was deported.  (Dkt. 1 at ¶ 23).  Respondents contend that Petitioner was involved in a fight, which caused another detainee to be sent to the hospital.  (Dkt. 10 at ¶ 15).  The encounter resulted in ten days of disciplinary segregation for Petitioner (*id.*; Dkt. 11-1 at ¶ 6), of which Petitioner only served one or two days (Dkt. 11-1 at ¶ 6).  After the incident, Petitioner was moved to the Orange County Jail.  (Dkt. 1 at ¶ 23).

Before the September 5, 2019, hearing, Petitioner's counsel filed a motion to produce so that Petitioner could be present for the proceedings, which the IJ initially denied.  (*Id.* at ¶ 54).  Petitioner's counsel moved for reconsideration at the September 5, 2019, hearing, citing concerns of using video teleconferencing in light of Petitioner's seizure condition.  (Dkt. 1 at ¶ 54; Dkt. 10 at ¶ 17).  The IJ granted the motion, and the hearing was scheduled for September 26, 2019, so Petitioner could appear in person.  (Dkt. 1 at ¶ 54; Dkt. 10 at ¶ 17).  The hearing began on September 26, and was continued until October 17, 2019.  (Dkt. 1 at ¶ 55; Dkt. 10 at ¶ 18).  On November 20, 2019, the IJ issued a written decision ordering Petitioner removed from the United States.  (Dkt. 1 at ¶ 56; Dkt. 10 at ¶ 20).

Petitioner appealed the decision to the Board of Immigration Appeals ("BIA") on December 18, 2019, and did not receive a transcript of the proceedings or briefing schedule from the BIA for almost three months.  (Dkt. 1 at ¶¶ 57-58; Dkt. 10 at ¶ 21).  On March

16, 2020, Petitioner was granted an extension of time within which to file his appellate brief, and his brief was filed on April 15, 2020.  (Dkt. 1 at ¶ 58; Dkt. 10 at ¶ 21).

On March 12, 2020, Petitioner was transferred to the BFDF without his counsel receiving notification.  (Dkt. 1 at ¶ 24; Dkt. 11-1 at ¶ 8).  On April 3, 2020, Petitioner's counsel filed a request for release with ICE's New York City Field Office in light of the COVID-19 pandemic.  (Dkt. 1 at ¶ 60).  The New York City Field Office stated that it lacked jurisdiction over the request, and forwarded it to the Buffalo Field Office on April 14, 2020.  (*Id.*).  Petitioner's request was denied.  (Dkt. 10 at ¶ 24).  On April 28, 2020, ICE again reviewed Petitioner's medical and criminal history and determined that continued detention was warranted.  (*Id.* at ¶¶ 22-23).

On June 2, 2020, the BIA dismissed Petitioner's appeal.  (Dkt. 14-2).  A petition for review was filed with the Second Circuit on June 30, 2020, Pet. for Review of Agency Order, *Vides v. Barr*, No. 20-2076, Dkt. 1 (2d Cir. June 30, 2020), and a motion for stay of removal was filed on July 2, 2020, Mot. for Stay of Removal, *Vides v. Barr*, No. 20-2076, Dkt. 8 (2d Cir. July 2, 2020).  Petitioner remains detained at the BFDF.  (Dkt. 1 at ¶ 3; Dkt. 10 at ¶ 28).

## II.  <u>COVID-19 and the BFDF</u>

COVID-19 has caused a global pandemic and public health emergency.  According to the World Health Organization, as of July 14, 2020, there were 12,929,306 confirmed cases of COVID-19 worldwide, with 569,738 confirmed deaths and 216 countries, areas, or territories impacted.  *See Coronavirus Disease (COVID-19) Pandemic*, World Health Org., https://www.who.int/emergencies/diseases/novel-coronavirus-2019 (last visited July

14, 2020).  According to reports in the *New York Times*, as of the morning of July 14, 2020, the U.S. tallies include at least 3,379,900 people who have tested positive for the virus and at least 135,400 patients with the virus who have died.  *See* Sarah Alkmukhtar, et al., *Coronavirus in the U.S.: Latest Map and Case Count*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited July 14, 2020).

On March 7, 2020, Governor Andrew Cuomo declared a state of emergency for all of New York State related to COVID-19.  *See* N.Y. Exec. Order No. 202 (Mar. 7, 2020), https://www.governor.ny.gov/sites/governor.ny.gov/files/atoms/files/EO_202.pdf.    The World Health Organization characterized COVID-19 a pandemic on March 11, 2020. *Coronavirus Disease 2019 (COVID-19) Situation Report 51*, World Health Org. (Mar. 11, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200311-sitrep-51-covid-19.pdf?sfvrsn=1ba62e57_10.   On March 13, 2020, President Donald Trump declared a national emergency.  Proclamation No. 9994, 85 Fed. Reg. 15337 (Mar. 13, 2020).

To aid efforts to halt the spread of COVID-19, the Centers for Disease Control and Prevention (the "CDC") advise the public to engage in "social distancing," to limit community movement,  and to cancel non-essential travel (including work travel). Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission, Ctrs. for Disease Control & Prevention (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy. pdf.

Although much remains unknown about COVID-19, the available data indicates that it poses a greater risk to older individuals and individuals with underlying health conditions such as type 2 diabetes mellitus, chronic kidney disease, and obesity, and may pose a greater risk for individuals with asthma, cerebrovascular disease, and neurological conditions such as dementia. *See Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html. There is also concern that correctional and detention facilities pose particular challenges in halting the spread of the virus. *See Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Ctrs. for Disease Control & Prevention (May 7, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (discussing that correctional facilities present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors").

New York State has adopted extreme measures to address the COVID-19 pandemic. On March 20, 2020, Governor Cuomo signed the "New York State on PAUSE" Executive Order, which, among other things, mandated a 100% closure of non-essential businesses statewide and temporarily banned all non-essential gatherings of individuals of any size for any reason other than the provision of essential services. *New York State on PAUSE*, New York State, https://coronavirus.health.ny.gov/new-york-state-pause (last visited July 14, 2020). On May 15, 2020, the Finger Lakes Region, in which the BFDF is located, began Phase 1 of New York's four phase re-opening plan. *Phase 1 of Reopening Underway in*

*Rochester*, WHEC (May 14, 2020, 9:22 AM), https://www.whec.com/news/phase-one-of-reopening-underway-in-rochester/5730419/.   The Finger Lakes Region has steadily progressed through the phases, and entered Phase 4 on June 26, 2020.  Randy Gorbman, *Finger Lakes "On Target" to Enter Phase 4 of Reopening on Friday*, WXXI News (June 23, 2020), https://www.wxxinews.org/post/finger-lakes-target-enter-phase-4-reopening-friday.  As of July 14, 2020, Genesee County, the county housing the BFDF, has reported 250 cases of COVID-19 and 5 deaths.  *Coronavirus in Our Community*, Rochester Regional Health, https://www.rochesterregional.org/coronavirus-covid19 (last visited July 14, 2020).

### III.   <u>Petitioner's Conditions of Confinement</u>

As previously discussed, Petitioner suffers from a seizure disorder.  (Dkt. 1 at ¶ 45).  He has had several seizures while in ICE custody, most recently on March 11, 2020, and April 6, 2020.  (*Id.*).  Petitioner contends that he has had these seizures despite taking his seizure medication daily (*id.*), while Respondents contend that he has a history of refusing to take his seizure medication (Dkt. 10-3 at ¶ 4).  Additionally, Petitioner represents that he has a history of asthma (Dkt. 1 at ¶ 48), but Respondents contend his medical records do not support a diagnosis of asthma and that Petitioner denied a history of asthma during his initial medical intake (Dkt. 10-3 at 3).  Petitioner also states that his access to medical care has become more limited since the spread of COVID-19 within BFDF.  (Dkt. 1 at ¶ 44).

Petitioner is presently housed in a celled dormitory unit with another individual in his cell.  (Dkt. 14-1 at ¶ 3).  The cell has two beds and its own toilet and sink.  (*Id.*).

Petitioner maintains that he cannot be six feet apart from his cellmate, particularly because they share the toilet.  (Dkt. 15-1 at ¶ 5).  Petitioner shares two showers with 40 people. (Dkt. 1 at ¶ 44).  Respondents contend that there is a schedule for shower times for each cell so that detainees may shower in isolation, and that detainees have access to cleaning supplies and disinfectant so that they may clean the showers and other surfaces before or after using them.  (Dkt. 10-4 at ¶¶ 4, 8; Dkt. 14-1 at ¶ 5).

Detainees may eat their meals in their cells to facilitate social distancing.  (Dkt. 10-4 at ¶ 5; Dkt. 14-1 at ¶ 6).  All employees and staff wear masks when interacting with detainees, and masks are provided to detainees in their housing units.  (Dkt. 10-4 at ¶ 7; Dkt. 14-1 at ¶ 7).  Posters and signs are posted in multiple languages to advise of the dangers of COVID-19 and the importance of social distancing and other exposure mitigation techniques.  (Dkt. 10-3 at ¶ 9; Dkt. 14-1 at ¶ 8).

As of April 28, 2020, there were 49 confirmed cases of COVID-19 in the BFDF. (Dkt. 1 at ¶ 43; Dkt. 14-1 at ¶ 10).  However, no new known COVID-19 cases have emerged at the BFDF since April 21, 2020: over 150 tests have been performed since that date, all with negative results.  (Dkt. 14-1 at ¶ 10).  Additionally, all detainees may receive a COVID-19 test upon request.  (*Id.* at ¶ 9).  Both Petitioner and his roommate were tested on June 30, 2020, and their tests came back negative.  (*Id.* at ¶ 12).

The BFDF has not been fully closed to the public because it houses the Batavia Immigration Court.  (Dkt. 1 at ¶ 41).  IJs, court personnel, facility personnel, attorneys, noncitizens' family members, and others continue to enter and exit BFDF daily.  (*Id.*).  The BFDF has implemented various procedures to address the continued foot traffic: the

Government represented at oral argument that when new detainees first enter the facility, they are tested for COVID-19 and quarantined for 14 days, and that every person who comes onto BFDF property is temperature screened.

## IV.   Procedural History

Petitioner filed the instant emergency Petition with this Court on May 5, 2020. (Dkt. 1). On June 2, 2020, Respondents filed their Answer and response (Dkt. 10), and Petitioner replied on June 8, 2020 (Dkt. 11). On June 20, 2020, Petitioner filed a supplemental letter informing the Court that the BIA had issued its decision, and that Petitioner had filed a petition for review with the Second Circuit. (Dkt. 12). The Court ordered supplemental briefing (Dkt. 13), which Respondents submitted on July 7, 2020 (Dkt. 14), and Petitioner on July 10, 2020 (Dkt. 15). Oral argument was held telephonically before the undersigned on July 13, 2020. (Dkt. 13).

## DISCUSSION

## I.   Legal Standard

The federal habeas corpus statute gives district courts jurisdiction to hear immigration-related detention cases. *See* 28 U.S.C. § 2241(c)(3); *Demore v. Kim*, 538 U.S. 510, 517-18 (2003) (holding federal courts have jurisdiction to review challenges to pre-removal detention); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001) (holding "§ 2241 habeas corpus proceedings remain available as a forum for statutory and constitutional challenges to post-removal-period detention" in immigration cases). District courts do not have jurisdiction over challenges to the legality of final orders of deportation, exclusion, and removal; jurisdiction to review such challenges rests exclusively in circuit courts. *See*

*Gittens v. Menifee*, 428 F.3d 382, 384 (2d Cir. 2005) ("[The REAL ID Act, 119 Stat. 231, § 106(a) (May 11, 2005)] eliminates habeas jurisdiction over final orders of deportation, exclusion, and removal, providing instead for petitions of review . . . which circuit courts alone can consider.").

"When a petitioner brings a habeas petition pursuant to § 2241, the petitioner 'bears the burden of proving that he is being held contrary to law; and because the habeas proceeding is civil in nature, the petitioner must satisfy his burden of proof by a preponderance of the evidence.'" *Dzhabrailov v. Decker*, No. 20-CV-3118 (PMH), 2020 WL 2731966, at *3 (S.D.N.Y. May 26, 2020) (quoting *Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011)); *see Cruz v. Decker*, No. 18-CV-9948 (GBD) (OTW), 2019 WL 7572975, at *3 (S.D.N.Y. Aug. 27, 2019) ("To obtain [ ] relief [under § 2241], the petitioner must show violation of his rights by a preponderance of the evidence." (citing *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997))), *report and recommendation adopted*, 2019 WL 6318627 (S.D.N.Y. Nov. 26, 2019).

## II.   **Named Respondents**

As a preliminary matter, the Government contends that Jeffrey J. Searls, Officer in Charge of the Buffalo Federal Detention Facility, is the only respondent with immediate custody over Petitioner, and consequently the only proper respondent.  (Dkt. 10-6 at 15). The Court agrees with the Government and dismisses all respondents except for Jeffrey Searls from the instant action.  *See Rodriguez v. Barr*, No. 6:18-cv-06757-MAT, 2019 WL 2192516, at *3 n.3 (W.D.N.Y. May 21, 2019) ("Searls is the only proper respondent in this § 2241 proceeding as he is the person with direct control over Petitioner's detention."

(citing *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004) ("[I]n habeas challenges to present physical confinement . . . the default rule is that the proper respondent is the warden of the facility where the prisoner is being held[.]"))); *Hassoun v. Sessions*, No. 18-CV-586-FPG, 2019 WL 78984, at *7 (W.D.N.Y. Jan. 2, 2019) ("The majority view in the Second Circuit requires the 'immediate custodian,' generally the prison warden, to be named as a respondent in 'core' immigration habeas proceedings—*i.e.*, those challenging present physical confinement." (quotation omitted)); *see also S.N.C. v. Sessions*, 325 F. Supp. 3d 401, 407 (S.D.N.Y. 2018) ("If, on the other hand, the petition challenges a broader form of legal, non-physical custody, then the proper respondent is the person with legal authority to effect that custody.").

## III.  <u>Procedural Due Process</u>

Petitioner argues that his continued detention without a bond hearing is a violation of his procedural due process rights.  For the following reasons, the Court finds that Petitioner is entitled to a bond hearing where the Government bears the burden of proving by clear and convincing evidence that Petitioner poses either a danger to the community or a risk of flight.

### A.  <u>Statutory Provision of Detention</u>

As a preliminary matter, the Court must determine which statutory provision Petitioner is presently detained under.  Respondent contends that Petitioner is currently

detained pursuant to 8 U.S.C. § 1231.  (Dkt. 14).  Petitioner maintains that he is currently detained pursuant to 8 U.S.C. § 1226(c).[1]  (Dkt. 15).

"The distinction between § 1226 and § 1231 essentially comes down to whether an alien is subject to a final order of removal." *Enoh v. Sessions*, 236 F. Supp. 3d 787, 793 (W.D.N.Y. 2017), *appeal withdrawn*, No. 17-1236, 2017 WL 6947858 (2d Cir. Dec. 7, 2017).  Section 1231 of the INA addresses detention of "immigrants in the 'removal period,' the term used in the statute to describe the 90-day period following an order of removal during which 'the Attorney General shall remove the alien.'"  *Hechavarria v. Sessions*, 891 F.3d 49, 54 (2d Cir. 2018) (quoting 8 U.S.C. § 1231(a)(1)(A)).  The removal period begins "on the latest of the following": (1) "[t]he date the order of removal becomes administratively final"; (2) "[i]f the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order"; and (3) "[i]f the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement."  8 U.S.C. § 1231(a)(1)(B).

In 2012, DHS and the Second Circuit entered into a forbearance agreement wherein the Government "has assured that removal will not occur" while the detainee has a petition for review pending before the Second Circuit.  *In re Immigration Petitions for Review Pending in U.S. Court of Appeals for Second Circuit*, 702 F.3d 160, 162 (2d Cir. 2012).  The overwhelming majority of courts in this Circuit have found that the forbearance

---

[1]    Respondent previously represented that Petitioner was initially detained pursuant to 8 U.S.C. § 1226(a).  (Dkt. 10-6 at 11).  However, at oral argument both parties agreed that prior to the BIA's denial of Petitioner's appeal, Petitioner was detained pursuant to § 1226(c).

agreement amounts to a "court order[ed] stay of the removal of the alien" and that detainees with a pending petition for review and motion to stay are not detained pursuant to § 1231. *See Sankara v. Whitaker*, No. 18-CV-1066, 2019 WL 266462, at *4 (W.D.N.Y. Jan. 18, 2019) (collecting cases); *see, e.g.*, *Yusuf v. Edwards*, No. 18-CV-3605 (GBD) (BCM), 2019 WL 4198798, at *5 & n.4 (S.D.N.Y. July 2, 2019) ("[B]ecause of the government's forbearance policy, an alien who files a PFR and a stay motion in the Second Circuit obtains 'the functional equivalent of a stay order,' such that § 1231 no longer governs his detention and he 'may not be denied a bond hearing on that basis.'" (collecting S.D.N.Y. cases)). For the reasons that this Court previously articulated in *Ranchinskiy v. Barr*, 422 F. Supp. 3d 789, 795-96 (W.D.N.Y. 2019), including based upon the Second Circuit's reasoning in *Hechavarria*, it agrees that § 1231 does not apply here.

Respondent contends that reliance on the Second Circuit's decision in *Hechavarria* is misplaced because the Second Circuit did not reach the issue of the forbearance agreement. (Dkt. 14 at 3). It is true that in *Hechavarria*, the Circuit had granted the petitioner's stay of removal while his petition for review was pending. *Id.* at 57. However, in the decision the Circuit held the petitioner was detained under § 1226(c) because "there remains a very clear impediment to his removal—review by this Court" and reasoned that "[g]iven the fact that such review has not been completed, it would make no sense to classify [the petitioner] in the same section of the statute that governs the removal of aliens who have no remaining barriers preventing their immediate removal." *Id.* Based on that same reasoning, courts have concluded that "the forbearance agreement amounts to a 'court order[ed] stay of the removal of the alien.'" *Sankara*, 2019 WL 266462, at *4 (alteration

in original) (quoting *Hechavarria*, 891 F.3d at 49); *see Ranchinskiy*, 422 F. Supp. 3d at 795-96; *see also Yusuf*, 2019 WL 4198798, at *5 & n.4; *Alexandre v. Decker*, No. 17 Civ. 5706 (GBD) (KHP), 2019 WL 1407353, at *5-6 (S.D.N.Y. Mar. 28, 2019) ("[T]he Second Circuit's forbearance policy is an insurmountable substantive impediment to Petitioner's removal until that Court issues a decision on his motion to stay."). *But see Narain v. Searls*, No. 19-CV-6361 (CJS), 2020 WL 95425, at *3-4 (W.D.N.Y. Jan. 8, 2020) (finding petitioner was detained pursuant to § 1231); *Nunez v. Searls*, No. 18-CV-6463 CJS, 2019 WL 2524308, at *2-3 (W.D.N.Y. June 19, 2019) (same), *appeal dismissed*, No. 19-2114 (2d Cir. June 26, 2020).

Respondent argues that the forbearance agreement differs from a stay because pursuant to the forbearance agreement, the Government may engage in removal after providing a 21-day notice to the Circuit, whereas if a stay has been ordered removal cannot occur until the Second Circuit decides the petition for review or vacates the stay. (Dkt. 14 at 4-5). The Court is not persuaded by this distinction. First, the Government has not filed a notice of intent to remove in Petitioner's case, so the forbearance agreement remains an impediment to removal. Second, even with the 21-day notice provision, the forbearance agreement still amounts to an impediment to removal just like a formal stay—albeit an impediment with arguably a shorter life span <u>if</u> the government takes the necessary steps to serve the requisite notice. In other words, the 21-day notice requirement is also a "barrier[] preventing . . . immediate removal," *Hechavarria*, 891 F.3d at 57, and the forbearance agreement effectively constitutes a consent order staying removal, which nonetheless can be lifted if the requisite notice is served and 21 days elapses without entry

of a temporary or formal stay.  The practical impact of the forbearance agreement is illustrated by a case cited by Respondent wherein the Second Circuit granted a temporary stay two days after receiving the Government's notice of intent to remove.  *See Yusuf*, 2019 WL 4198798, at *3.

For all these reasons, the Court finds that § 1231 does not apply, and Petitioner is presently detained pursuant to § 1226(c).

### B. <u>Petitioner Is Entitled to a Bond Hearing</u>

For the reasons previously articulated in other decisions by this Court, *see, e.g.*, *Ranchinskiy*, 422 F. Supp. 3d at 797; *Constant v. Barr*, 409 F. Supp. 3d 159, 167-68 (W.D.N.Y. 2019), this Court agrees with the overwhelming majority of courts in this Circuit that the multi-factor approach articulated by the court in *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 WL 2357266, at *1 (S.D.N.Y. May 23, 2018), *appeal withdrawn*, No. 18-2591, 2019 WL 4137822 (2d Cir. May 7, 2019), and other courts within this Circuit, is a useful tool for addressing procedural due process claims for aliens detained pursuant to § 1226(c) in the immigrant habeas context.  Those non-inclusive factors are as follows:

> (1) the length of time the petitioner has been detained; (2) the party responsible for the delay; (3) whether the petitioner has asserted defenses to removal; (4) whether the detention will exceed the time the petitioner spent in prison for the crime that made him removable; (5) whether the detention facility is meaningfully different from a penal institution for criminal detention; (6) the nature of the crimes committed by the petitioner; and (7) whether the petitioner's detention is near conclusion.

*Cabral v. Decker*, 331 F. Supp. 3d 255, 261.

As to the first factor, Petitioner has been detained in immigration custody since March 28, 2019.  Thus, "[t]he first and 'most important' . . . factor weighs heavily in favor

of granting the petition."  *Bermudez Paiz v. Decker*, No. 18-CV-4759 (GHW) (BCM), 2018 WL 6928794, at *13 (S.D.N.Y. Dec. 27, 2018) (citation omitted).  "[C]ourts in this Circuit have generally been skeptical of prolonged detention of removable immigrants, without process, lasting over six months," *Lett v. Decker*, 346 F. Supp. 3d 379, 387 (S.D.N.Y. 2018) (quoting *Lopez v. Sessions*, No. 18 Civ. 4189 (RWS), 2018 WL 2932726, at *14 (S.D.N.Y. June 12, 2018)), *appeal filed*, No. 18-3714 (2d Cir. Dec. 11, 2018), and "courts have found detention shorter than a year to be unreasonably prolonged as part of procedural due process analysis," *Rosado Valerio v. Barr*, No. 19-CV-519, 2019 WL 3017412, at *4 (W.D.N.Y. July 10, 2019) (collecting cases), *appeal dismissed*, No. 19-2848, 2020 WL 1126526 (2d Cir. Jan. 9, 2020).

The record before the Court shows that Petitioner has been detained for roughly 16 months without meaningful process.  Petitioner received an initial custody determination in March 2019 and he requested an IJ to review the determination but never received such review. (Dkt. 10-2 at 19).  Additionally, ICE reviewed Petitioner's detention in April 2020, but found that Petitioner "ha[d] not established to ICE's satisfaction that [he] is not a flight risk" or "danger to the community."  The April 2020 custody determination makes clear that the burden of proof was on Petitioner to prove he is not a flight risk or danger to the community, and as discussed below, the Court finds that due process requires the Government to bear this burden.  Consequently, the first factor weighs heavily in Petitioner's favor.  *See, e.g.*, *Bermudez Paiz*, 2018 WL 6928794, at *30 (first factor weighed heavily in petitioner's favor where petitioner had been detained for more than 16 months since his parole had been revoked); *Joseph v. Decker*, No. 18-CV-2640(RA), 2018

WL 6070567, at *11 (S.D.N.Y. Nov. 21, 2018) (first factor weighed in petitioner's favor where petitioner had been detained for over 14 months).

Respondent contends that the second factor in the analysis—which party is responsible for the delay—undercuts a finding of an unreasonable length of detention in Petitioner's case because "Petitioner's detention is due to his own actions."  (Dkt. 10-6 at 12).  For procedural due process claims, when "considering whether [Petitioner] or the Government is responsible for the prolonged proceedings, the Court 'may examine the record to determine whether the alien sought repeated or unnecessary continuances, or filed frivolous claims and appeals.'"  *Vallejo v. Decker*, No. 18-CV-5649, 2018 WL 3738947, at *4 (S.D.N.Y. Aug. 7, 2018) (quoting *Sopo v. U.S. Att'y Gen.*, 825 F.3d 1199, 1218 (11th Cir. 2016), *vacated on other grounds*, 890 F.3d 952 (11th Cir. 2018)); *see Sajous*, 2018 WL 2357266, at *11 ("[A]liens who are merely gaming the system to delay their removal should not be rewarded with a bond hearing that they would not otherwise get under the statute." (quoting *Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 476 (3d Cir. 2015))).  "[C]ourts should keep in mind that 'aliens should not be punished for pursuing avenues of relief and appeals[,]' but evidence of bad faith delays may cut against them." *Hernandez v. Decker*, No. 18-CV-5026 (ALC), 2018 WL 3579108, at *7 (S.D.N.Y. July 25, 2018) (quotation omitted), *appeal withdrawn*, No. 18-2824, 2019 WL 1377025 (2d Cir. Feb. 5, 2019).

Here, a significant portion of the delay between April 2019 (when Petitioner requested a continuance to seek counsel) and September 2019 (when the merits hearing before the IJ began), can be attributed to requests for adjournment made by Petitioner.

However, the record does not show that Petitioner was engaging in bad faith delay tactics. To the contrary, Petitioner's requests for continuances were made to obtain counsel, for counsel to prepare for the merits hearing, and for Petitioner to appear in person for his merits hearing instead of via videoconference due to concerns regarding his seizure disorder.  (Dkt. 1 at ¶¶ 49-54; Dkt. 10 at ¶¶ 9-17).  Further, the record indicates that the proceedings were then adjourned multiple times due to the pending adjudication of the motion to suppress evidence and of Petitioner's I-589 application for asylum, withholding of removal, and relief under the Convention Against Torture.  (Dkt. 1 at ¶¶ 49-54; Dkt. 10 at ¶¶ 9-17).  As such, it would not be appropriate to utilize these requests for adjournment to penalize Petitioner.  *See, e.g.*, *Sopo*, 825 F.3d at 1218; *Vallejo*, 2018 WL 3738947, at *4; *Hernandez*, 2018 WL 3579108, at *7; *Sajous*, 2018 WL 2357266, at *11.  On the other hand, it is apparent that Petitioner's continued detention and stay of removal has been triggered by the pending appeal, although the Court cannot state that Petitioner's appeal is frivolous or in bad faith.  *See Hechavarria*, 891 F.3d at 56 n.6 (noting the Supreme Court has given weight to a petitioner's decision to pursue review of a removal order in the "context only of an immigrant who has 'substantially prolonged his stay by abusing the processes provided to him,' *Nken v. Holder*, 556 U.S. 418, 436 (2009)—not of an immigrant who simply made use of the statutorily permitted appeals process").  Thus, while much of the delay rests with Petitioner's litigation strategy, the Court cannot conclude that that strategy has been employed for purposes of creating delay.

As for the third factor, Petitioner has asserted defenses to removal in his immigration proceedings.  He has asked for relief under the CAT, has applied for asylum,

and contends that the IJ improperly did not require DHS to authenticate evidence at the merits hearing and did not properly consider the evidence presented by Petitioner.  (Dkt. 1 at 19).  "The Court need not inquire into the strength of [Petitioner's] defenses—it is sufficient to note their existence and the resulting possibility that the Petitioner will ultimately not be removed, which diminishes the ultimate purpose of detaining the Petitioner pending a final determination as to whether he is removable."  *Sajous*, 2018 WL 2357266, at \*11; *see Cabral*, 331 F. Supp. 3d at 261-62 (finding the third factor weighed in petitioner's favor because he asserted several defenses to his removal "including asylum . . . and relief under the Convention Against Torture"); *Perez v. Decker*, No. 18-CV-5279 (VEC), 2018 WL 3991497, at \*5 (S.D.N.Y. Aug. 20, 2018) ("Petitioner has made a claim for asylum that could be a defense to his removal, again tilting the scales toward his unreviewed detention being unreasonable.").  Accordingly, this factor weighs in Petitioner's favor.

The fourth factor also weighs in Petitioner's favor.  His detention has been significantly longer than the time that he spent in prison for the crime that made him removable—Petitioner was not sentenced to any time in prison as a result of his convictions.  (Dkt. 10 at ¶ 4; Dkt. 10-2 at 6).

The fifth factor—whether the detention facility is meaningfully different from a penal institution for criminal detention—is at best neutral.  Respondent has submitted a declaration describing the conditions of confinement at the BFDF as not consisting of "the same level of restrictions typical for someone held at a prison."  (Dkt. 11-7 at ¶ 7).  However, even with the amenities, such as entertainment and "arts & crafts," detailed in

that declaration (*id.* at ¶¶ 6-7), the reality is that the facility houses individuals against their will with various restrictions on their freedom of movement.   Indeed, Respondent's declaration also notes that the BFDF is required to comply with the <u>Prison</u> Rape Elimination Act.  (*Id.* at ¶ 12).  Thus, while perhaps not akin to a maximum-security prison, for many individuals, even crediting the description set forth in the declaration, the facility does not seem meaningfully different from at least a low-security penal institution for criminal detention.

The sixth factor, the nature of the crime Petitioner was convicted of, weighs against Petitioner on its face, but the underlying facts are certainly unique.  In December 2016, Petitioner pleaded guilty to a violent crime—manslaughter in the second degree.  *See Constant*, 409 F. Supp. 3d at 171 (finding sixth factor weighed against the petitioner where he had pleaded guilty to committing the violent crimes of manslaughter and attempted assault, as well as trafficking firearms).  However, the Court notes that while past criminal convictions, particularly of violent offenses, are critical to evaluating a petitioner's risk of danger to the community, "[t]he process due even to excludable aliens requires an opportunity for an evaluation of the individual's *current* threat to the community and his risk of flight."  *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 240 (W.D.N.Y. 2019) (quoting *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398 (3d Cir. 1999)).  Moreover, the conviction in this case represents no ordinary manslaughter conviction, given the underlying tragic facts and circumstances.  Also, there is no evidence in the record showing that Petitioner poses a current threat to the community—indeed, he was sentenced to no

incarceration for the manslaughter conviction.  Thus, on the whole, the Court considers this factor as neutral.

The final factor, whether Petitioner's detention is near conclusion, arguably weighs in Petitioner's favor.  The merits of Petitioner's petition for review have not yet been briefed before the Second Circuit, and it is unclear when the Second Circuit will issue its decision.  *See Dukuray v. Decker*, No. 18 CV 2898 (VB), 2018 WL 5292130, at *5 (S.D.N.Y. Oct. 25, 2018) ("[T]here is 'significant reason to believe that [petitioner's detention] will continue . . . because . . . he would remain detained throughout the course of an appeal by either side.'" (second alteration in original) (quoting *Lett*, 346 F. Supp. 3d at 387)).

Thus, on balance and particularly in view of the length of the detention and the circumstances surrounding that detention, the Court finds that Petitioner's continued detention without a bond hearing is constitutionally unjustified.  *See Arce-Ipanaque v. Decker*, No. 19-CV-1076 (JMF), 2019 WL 2136727, at *2 (S.D.N.Y. May 15, 2019) ("At bottom, the minimal burden that a bond hearing would place on the Government is far outweighed by [the petitioner]'s interest in ensuring that his continued detention is justified." (quotation and original alteration omitted)).

Taking all of the above into consideration, the Court finds "the 'minimal burden' that a bond hearing would place on the Government is far outweighed by [Petitioner]'s interest in 'ensur[ing] that his continued detention is justified,'" *Arce-Ipanaque*, 2019 WL 2136727, at *2 (quoting *Vallejo*, 2018 WL 3738947, at *5), and due process requires that Petitioner receive a bond hearing where the government must demonstrate dangerousness

or flight risk by clear and convincing evidence.  Additionally, the Court finds that both due process and BIA precedent require the IJ to consider ability to pay and alternative conditions of release in setting bond.  *See Abdi v. Nielsen*, 287 F. Supp. 3d 327, 335-39 (W.D.N.Y. 2018); *see also Hernandez v. Sessions*, 872 F.3d 976, 991 & n.4 (9th Cir. 2017) ("A bond determination that does not include consideration of financial circumstances and alternative release conditions is unlikely to result in a bond amount that is reasonably related to the government's legitimate interests."); *Arce-Ipanaque*, 2019 WL 2136727, at *3 (collecting cases); *Lett*, 346 F. Supp. 3d at 389 ("The Court agrees with Petitioner that an immigration bond hearing that fails to consider ability to pay or alternative conditions of release is constitutionally inadequate."); *Hernandez*, 2018 WL 3579108, at *12 ("[T]he Due Process Clause requires than an IJ consider ability to pay and alternative conditions of release in setting bond." (quotation and alteration omitted)).

## IV.   <u>Substantive Due Process</u>

Petitioner also claims that he is being held in unsafe conditions in violation of his Fifth Amendment right to substantive due process.  "In order to establish a violation of a right to substantive due process, a plaintiff must demonstrate not only government action but also that the government action was so 'egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'"  *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)).  "Immigration detainees can establish a due process violation for unconstitutional conditions of confinement by showing that a government official 'knew, or should have known' of a condition that 'posed an excessive risk to health,' and failed to take appropriate

action." *Basank v. Decker*, __ F. Supp. 3d __, No. 20 CIV. 2518 (AT), 2020 WL 1481503, at *5 (S.D.N.Y. Mar. 26, 2020) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017)); *see also Coronel v. Decker*, __ F. Supp. 3d __, No. 20-CV-2472 (AJN), 2020 WL 1487274, at *3 (S.D.N.Y. Mar. 27, 2020) ("The Due Process Clause . . . prohibits the federal government from being deliberately indifferent to the medical needs of civil detainees."). As the *Coronel* court explained:

> [A] petitioner establishes a claim for deliberate indifference by proving that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety.

2020 WL 1487274, at *4 (quotation and original alteration omitted).

Petitioner claims that his medical conditions place him at high risk from COVID-19, and that the conditions at the BFDF are sufficiently serious as to pose a substantial risk of serious harm to him. Respondent contends that Petitioner does not suffer from medical conditions that make him high risk, and that the steps taken by Respondent to prevent the spread of COVID-19 do not demonstrate deliberate indifference. (Dkt. 10-6 at 6-10). The Court finds that Petitioner has failed to meet his burden of showing that he suffers from medical conditions that make him vulnerable in the event that he contracts COVID-19 and as a result has failed at this time to demonstrate that he has a serious medical need.

Courts in this Circuit have overwhelmingly, if not exclusively, found that immigration detainees who suffer from medical conditions that put them at high risk if infected with COVID-19 have a serious medical need for purposes of the deliberate

indifference analysis.  *See, e.g.*, *Jones*, 2020 WL 1643857, at *7-8; *Basank*, 2020 WL 1481503, at *3; *Coronel*, 2020 WL 1487274, at *5.  The parties dispute several key aspects of Petitioner's claimed underlying medical conditions: (1) whether Petitioner's asthma, if he suffers from it, is severe enough to make him high-risk if infected with COVID-19; and (2) whether Petitioner's seizure disorder places him at a higher risk.

The Court finds Petitioner has not demonstrated by a preponderance of the evidence that either of his alleged conditions makes him a vulnerable individual in the context of COVID-19.  Petitioner primarily relies on a four page, unsworn, unsigned document purportedly written by Laura S. Boylan, M.D., wherein Dr. Boylan represents that her review of Petitioner's medical records shows that Petitioner "had pre-existing asthma and was on inhalers prior to the accident," as well as opines that Petitioner's seizure disorder places him at higher risk of complications from COVID-19.  (Dkt. 11-4 at 3-4).  However, as noted, this statement from Dr. Boylan is unsworn and unsigned, and Petitioner has not submitted any medical records to substantiate his claims.  In contrast, Respondent has a provided a sworn declaration by Captain Carlos Quinones, M.D., who states that Petitioner's medical records do not support a history of asthma.  (Dkt. 10-3 at ¶ 7).  Respondent also points to CDC guidance which lists only moderate to severe asthma as placing individuals at higher risk from COVID-19, and does not recognize seizures or epilepsy as making an individual more susceptible to the disease.  (Dkt. 10-6 at 9); *see Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/ 2019-ncov/need-extra-precautions/groups-at-higher-risk.html.

The Court finds that the document from Dr. Boylan to be an insufficient basis from which the Court can determine whether Petitioner's seizure disorder makes him a vulnerable individual.  Again, the document is unsworn and unsigned.  *See Estate of Keenan v. Hoffman-Rosenfeld*, No. 16CV0149SFJAYS, 2019 WL 3410006, at *17 (E.D.N.Y. July 29, 2019) ("[T]here is no notary jurat indicating that Dr. Peyster swore to or affirmed the truthfulness of his declarations.  Therefore, the Court need not consider it."); *Jay v. Glob. Foundries U.S. Inc.*, No. 5:15-CV-1066, 2018 WL 1441297, at *3 (N.D.N.Y. Mar. 22, 2018) ("[D]efendant's unsworn expert report will not be considered."), *aff'd*, 758 F. App'x 209 (2d Cir. 2019).  Additionally, the document contains no citations to scientific studies that support Dr. Boylan's contentions.  This lack of support is particularly fatal in the present context where there does not appear to be a scientific consensus as to whether a seizure disorder makes an individual prone to serious complications from COVID-19.  For example, the Epilepsy Foundation has represented that epilepsy alone "[d]oes not increase the risk of getting COVID-19" and "[d]oes not increase the severity of COVID-19," *COVID-19 and Epilepsy*, Epilepsy Foundation of Am., https://www.epilepsy.com/learn/covid-19-and-epilepsy (last visited July 11, 2020), and the CDC has not listed seizures as a condition that makes an individual high risk.  Courts that have found that petitioners suffer from a serious medical need for purposes of the deliberate indifference analysis in the context of the COVID-19 pandemic have done so only for detainees suffering from conditions recognized by the CDC as placing individuals at higher risk.  *See, e.g.*, *Ramsundar v. Wolf*, No. 20-CV-361, 2020 WL 1986923, at *2 (W.D.N.Y. Apr. 27, 2020) ("Because petitioners . . . did not meet the CDC

criteria for COVID-19 vulnerability, the Court found that the respondents were not acting with deliberate indifference to their medical needs and consequently denied their motions."), *amended*, No. 20-CV-361, 2020 WL 2557832 (W.D.N.Y. May 20, 2020); *Basank*, 2020 WL 1481503, at *3 (identifying health and safety risks posed by COVID-19 based on CDC guidance); *Coronel*, 2020 WL 1487274, at *5 (finding the petitioners, who had major organs partially removed, type 2 diabetes, obesity, and hypertension, were "particularly vulnerable to severe illness or death if infected by COVID-19").

Petitioner argues that the CDC has identified neurological conditions as placing individuals at higher risk.  (Dkt. 1 at ¶ 27).  However, the most recent CDC guidance identifies "neurological conditions such as *dementia*" as potentially placing individuals at higher risk, and does not mention seizure disorders.  *See Coronavirus Disease 2019 (COVID-19): People Who Need to Take Extra Precautions*, Ctrs. for Disease Control & Prevention (July 2, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (emphasis added).  Nor has Petitioner produced anything that demonstrates a relevant connection between dementia and seizures, particularly as it relates to COVID-19.  Such tenuous support is not sufficient to meet Petitioner's burden in the instant matter.

Moreover the Court cannot find on the record before it that Petitioner has demonstrated by a preponderance of the evidence that his alleged asthma makes him a vulnerable individual.  Even if Petitioner's medical record, which is not presently before the Court, does indicate that Petitioner "had pre-existing asthma and was on inhalers prior to the accident" (Dkt. 11-4 at 3-4), and the Court fully credits Petitioner's declaration where

he states that he has "a history of asthma," was "first diagnosed with asthma as a teenager and was prescribed inhalers for a number of years" (Dkt. 11-1 at ¶ 2), this evidence does not show that Petitioner presently suffers from asthma, or that any such asthma rises to the level in the CDC guidance of moderate or severe.

Accordingly, the Court finds that Petitioner has not established based on the present record that he is a vulnerable individual and denies his substantive due process claim.  This does not mean that Petitioner cannot show that he is a vulnerable individual—it is entirely possible that Petitioner could present more substantial evidence that his seizure disorder places him at high risk from a COVID-19 infection or that he presently suffers from moderate to severe asthma.  Therefore, the denial of this portion of the Petition is without prejudice.

## <u>CONCLUSION</u>

For the foregoing reasons, the Petition (Dkt. 1) is granted in part to the extent that the Court orders Respondent to afford Petitioner an individualized bond hearing consistent with the procedures outlined in this Decision and Order within 14 days of its entry.  If Petitioner requests a continuance that results in a bond hearing date outside the 14-day deadline set forth above, such a continuance will be in compliance with the instant Decision and Order, as long as the new date falls within a reasonable time period.  Respondent is directed to file a status update with the Court within three (3) days of the date of Petitioner's bond hearing regarding the outcome of the hearing, or on or before July 31, 2020, whichever date is earlier.  The Court denies Petitioner's substantive due process claim without prejudice.  The Clerk of Court is directed to enter judgment and close this case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: July 14, 2020
      Rochester, New York